IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM. NO. 23-00126-TFM-MU |
| | ) | |
| HASSAN DECALPTON JONES | ) | |

**UNITED STATES' RESPONSE**

The United States, by and through Sean P. Costello, the United States Attorney for the Southern District of Alabama, respectfully urges this Court to deny Hassan Decalpton Jones's ("Jones's") motion to dismiss the firearm charges in his indictment. [Doc. 30]. The Second Amendment ensures that law-abiding citizens may possess firearms in ordinary circumstances. It does not convey any right for a violent lawbreaker like Jones to possess multiple firearms—including one equipped with a Glock switch—as he carries out a drug offense. Multiple statutes prohibit Jones's conduct, and rightly so. These criminal prohibitions fit neatly within the history and tradition of firearm regulations in the United States.

**I.      Background**

A federal grand jury in the Southern District of Alabama returned an indictment that charged Jones with drug and firearm offenses. [Doc. 1]. Relevant to this motion, the indictment asserted three violations of federal firearms laws. [*Id.* at 2–5, PageID.2–5]. First, the indictment alleged that Jones possessed two Glock pistols in furtherance

1

of a marijuana trafficking scheme as prohibited by 18 U.S.C. § 924(c). [*Id.* at 2–3, PageID.2–3]. It stated that one pistol included a Glock switch and therefore subjected Jones to the penalties for a machinegun set out in § 924(c)(1)(B)(ii). Second, the indictment charged Jones with the unlawful possession of the two Glock pistols as a convicted felon in violation of 18 U.S.C. § 922(g)(1). [*Id.* at 3–4, PageID.3–4]. The indictment indicated that Jones amassed numerous convictions in Alabama state courts, to include robbery in the second degree, assault in the second degree, shooting into an occupied automobile, shooting into an occupied dwelling, and shooting into an unoccupied automobile. [*Id.*]. Third, the indictment asserted that Jones possessed an unregistered firearm under 26 U.S.C. § 5861(d). [*Id.* at 4–5, PageID.4–5]. As the indictment set out, one of Jones's Glock pistols included a Glock switch that was not registered to him. [*Id.*].

Jones moved to dismiss these firearm charges on the ground that the offenses violate the Second Amendment. [Doc. 30]. He frames his challenge to the three statutes as facial ones. [*Id.* at 2, PageID.117]. This Court ordered the United States to respond to the motion. [Doc. 31] (text only order).

## II.   Legal Standards

A defendant may raise a defense before trial if the Court can decide the issue "without a trial on the merits." Fed. R. Crim. P. 12(b)(1). To mount a facial challenge to a federal statute, a challenger typically must show that the statute is unconstitutional

2

in all its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987). A ruling by the Eleventh Circuit on an issue remains decisive unless and until the Supreme Court or the Eleventh Circuit sitting *en banc* overrules that decision. *United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (*en banc*) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong.").

### III. Legal Discussion

The Second Amendment protects a law-abiding citizen's right to possess certain typical firearms for ordinary self-defense purposes. Jones is a convicted felon many times over who possessed two Glock pistols—including one with a Glock switch—as he participated in drug distribution. Unremarkably, the Second Amendment offers no cover to dangerous individuals like Jones. Jones's charges are constitutional.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. This right is an individual right for law-abiding citizens. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (concluding that the Second Amendment conveys an individual right that is "not unlimited" in the vein of other constitutional rights); *see also McDonald v. City of Chicago*, 561 U.S. 742, 749–50 (2010) (applying *Heller* to state and local governments as well as the federal government). To interpret the nature and the scope of that right, the Supreme Court looked to history and tradition. *See, e.g.*, *Heller*, 554 U.S. at 584–85, 592–95 (construing

3

the Second Amendment in the context of English and early American laws). Based on those traditions, the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The *Heller* Court cautioned that it did not, however, "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

Subsequently, the Supreme Court held that the Second Amendment also protects "an individual's right to carry a handgun for self-defense outside the home." *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122 (2022). As in *Heller*, the *Bruen* Court turned to history and tradition to discern the contours of the Second Amendment. *Id.* at 2131. The *Bruen* Court consistently indicated that the Second Amendment only extends to the law-abiding. *Id.* at 2122, 2131, 2133, 2150, 2156. As the *Bruen* Court put it, a New York licensing scheme failed to pass muster because it prevented "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156. Along the way, the *Bruen* Court rejected the "means-end scrutiny" that various courts of appeals had applied to Second Amendment challenges after *Heller*. *Id.* at 2128–29. Instead, the *Bruen* Court searched the historical record for earlier comparators to a contemporary regulation. *Id.* at 2132–33. It found that record lacking in the case of the New York regime. *Id.* at 2156.

Jones is not a law-abiding citizen, and he did not possess two Glock pistols and a Glock switch in connection with ordinary self-defense needs. On the contrary, Jones was a convicted felon many times over who possessed these dangerous instruments as part of a drug distribution scheme. His facial challenge falls apart for that reason alone: all three of these statutes clearly apply constitutionally in his own case. *See Salerno*, 481 U.S. at 745 (explaining that a challenger who brings a facial challenge typically must show that a law is invalid in all circumstances). Proceeding to the merits of these statutes, § 922(g)(1), § 924(c), and § 5861(d) are constitutional because they are in accord with existing law and historical practices.

### A. Congress may Disarm Convicted Felons.

Congress may disarm convicted felons. Section 922(g)(1) is consistent with the Second Amendment for three reasons: (1) the Eleventh Circuit has upheld § 922(g)(1), and its decision remains good law; (2) the Second Amendment extends to law-abiding citizens, not lawbreakers; and (3) § 922(g)(1) is consistent with historical regulations on felons as well as traditional views on disarmament.

First, § 922(g)(1) is constitutional under current Eleventh Circuit precedent. After *Heller*, the Eleventh Circuit upheld the constitutionality of § 922(g)(1). *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010). The *Rozier* Court did not apply means-end scrutiny. Instead, it noted that a convicted felon's status "substantially affects the level of protection those [constitutional] rights are accorded." *Id.* at 771.

5

Then, the Court relied on *Heller*'s discussion of longstanding prohibitions on felon possession. *Id.* at 771. *Rozier* indicated that *Heller*'s general conclusion that the Second Amendment protects law-abiding citizens was part of its reasoning and credited *Heller*'s specific discussion of felon disarmament as persuasive even if it was *dicta*. Id. at 771 n.6.

*Rozier* is consistent with *Bruen*. For starters, *Bruen* merely applied *Heller*'s framework. *Bruen*, 142 S. Ct. at 2131. It did not disturb *Heller*'s analysis or its discussion of longstanding prohibitions. Moreover, the Eleventh Circuit did not apply means-end scrutiny in *Rozier*. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1053 (11th Cir. 2022) (Newsom, J., concurring) (citing *Rozier* as an example of a decision that upheld a prohibition on firearm possession without resorting to means-end scrutiny in a concurring opinion that questioned the viability of means-end scrutiny). The *Jimenez-Shilon* concurrence is persuasive because its analysis effectively anticipated the Supreme Court's framework in *Bruen*. Indeed, numerous courts within the Eleventh Circuit have continued to follow *Rozier* after *Bruen*. *See, e.g.*, *United States v. Mitchell*, No. 1:22-cr-00111-KD-B, 2022 WL 17492259, at *1 (S.D. Ala. Nov. 17, 2022) (DuBose, J.) (rejecting a post-*Bruen* challenge to § 922(g)(1)), *United States v. Meyer*, No. 22-10012-CR-ALTMAN, 2023 WL 3318492, at *2 (S.D. Fla. May 9, 2023) (applying *Rozier*), *United States v. Kirby*, No. 3:22-cr-26-TJC-LLL, 2023 WL 1781685, at *2–*3 (M.D. Fla. Feb. 6, 2023) (continuing to follow *Rozier*), *United States v. Isaac*, No. 5:22-cr-117-LCB-HNJ-1,

6

2023 WL 1415597, at *3–*4 (N.D. Ala. Jan. 31, 2023) (following *Rozier*), *and United States v. Hunter*, - - - F. Supp. 3d - - - -, No. 1:22-cr-84-RDP-NAD-1, 2022 WL 17640254, at *3–*6 (N.D. Ala. Dec. 13, 2022) (continuing to apply *Rozier*).

Jones asserts that *Bruen* abrogated *Rozier*. [Doc. 30, 32–33, PageID.147–48]. He critiques the lack of "historical analysis" in *Rozier*, but *Rozier* built on the historical foundation in *Heller*. [*Id.* at 33, PageID.148]. *Bruen* followed *Heller*, and it addressed only law-abiding citizens. *Bruen* did not fling open the doors to firearm possession for convicted felons.

Second, the Second Amendment protects law-abiding citizens. The law-abiding qualifier emerges not from the phrase "the people" but instead arises from the nature of the pre-existing right that could not be "infringed." *See* U.S. Const. Amend. II (outlining the right). *Heller* emphasized that the Second Amendment "codified a *pre-existing* right" that derived from English law. 554 U.S. at 592 (emphasis in the original). The English protection extended only to Protestants and excluded Catholics. *Id.* at 593. This exclusion connected to English views of criminality, as English law included criminal penalties for Catholics who refused to attend the Church of England. *Id.* at 582. Unsurprisingly, the *Bruen* Court consistently framed the Second Amendment as a right that protects law-abiding citizens. *Id.* at 2133 (directing courts to consider "how and why" a contested regulation "burden[s] a law-abiding citizen's right to armed self-defense").

Indeed, *Bruen*'s presumption that a restriction on firearms is unconstitutional makes sense when it is viewed in this light. Presumptions serve to establish consistency and efficiency in the law. A presumption of invalidity serves a purpose if it is applied to laws of general applicability that restrain the rights of law-abiding citizens to possess common weapons for self-defense purposes. Of course, restrictions still may be valid in such cases but only if the law has adequate historical support. It makes little sense, however, to apply such a presumption to discrete laws that disarm dangerous individuals or particular settings in which firearms pose great risks. For example, the Court should not expect local governments to step forward with an exhaustive historical analysis to support an ordinance that bars firearms inside a local school or a policy that excludes firearms from a county jail. The disarmament of convicted felons falls within this same vein. Such an approach would distort *Bruen* well beyond its boundaries.

Jones argues that he is entitled to possess a gun because he is part of the people as the Second Amendment uses the term. [Doc. 30, 18, PageID.133]. This argument ignores the broader historical analysis that *Heller* employed. The right the Second Amendment conveys to the people is a version of the right that existed in English law. That right did not extend to convicted felons. *See Rozier*, 598 F.3d at 771 and n.5 (explaining that a felony conviction often affects an individual's rights).

Third, § 922(g)(1) easily passes the *Bruen* analysis for similar reasons. At the core, the *Bruen* examination looks for a historical parallel to a modern statute that regulates a

8

law-abiding citizen's right to bear arms. 142 S. Ct. at 2132–33. This Court should assess "how and why" a regulation burdens a law-abiding citizen's right to possess a firearm for self-defense purposes. *Id.* at 2133. The comparators should be "well-established and representative" but need not be identical. *Id.*

Section 922(g)(1) compares to traditional laws that punished felons and to disarmament provisions that pertained to disloyal or dangerous individuals. Legislatures traditionally have maintained expansive latitude to define crimes and to set the punishments for those offenses. *Finley v. People of Cal.*, 222 U.S. 28, 31 (1911) ("The power of classification which the lawmaking power possesses has been illustrated by many cases which need not be cited."); *see also United States v. Campbell*, 743 F.3d 802, 810–11 (11th Cir. 2014) (collecting and examining historical authorities on felony offenses for purposes of interpreting the Felonies Clause of the Constitution). That power included the authority to establish capital punishment. When Congress enacted the earliest federal crimes, it imposed death as a sanction for various offenses. Crimes Act of 1790, 1 Stat. 112, 115 (1790); *see also Gregg v. Georgia*, 428 U.S. 153, 177 (1976) (plurality opinion of Stewart, J.) ("[T]he First Congress of the United States enacted legislation providing death as the penalty for specified crimes.").

Indeed, capital punishment "was 'the standard penalty for all serious crimes.'" *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment)). Given the ubiquity of capital

punishment, the founding generation had little reason to worry that felons would later access a gun. *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334, 343 (5th Cir. 2013) (Jones, J., dissenting from the denial of rehearing *en banc*) (deeming "gun ownership by felons" to be a "non-issue" in the early Republic due to widespread capital punishment and forfeiture).

Disarmament resembles these traditional sanctions for felony offenses. Indeed, it is a less severe sanction than capital punishment or the forfeiture of all lands or chattels. It also is similar to other traditional impacts from a felony conviction, such as disenfranchisement. *See, e.g.*, *Johnson v. Gov. of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005) (*en banc*) (recognizing the "deeply rooted" nature of disenfranchisement provisions). Accordingly, disarmament is consistent with traditional sanctions for felons and compatible with the broad power of legislatures to define felony offenses.

In addition, early governments disarmed individuals perceived as dangerous or disloyal. For example, *Heller* cited to commentary on the disarmament of Catholics because the English government at that time perceived Catholics as disloyal or criminal actors. 554 U.S. at 582. Likewise, the Eleventh Circuit has noted colonial initiatives to disarm individuals based on concerns about loyalty and danger. *Jimenez-Shilon*, 34 F.4th at 1047–48 (collecting sources).

Numerous jurisdictions disarmed groups that the government deemed to be dangerous or otherwise incapable of possessing firearms. *See, e.g.*, Act of Mar. 14, 1776,

10

ch. VII, 1775-1776 Mass. Acts at 31–32, 35 (disarming those who would not participate in the American Revolution), An Ordinance Respecting the Arms of Non-Associators, § 1, 1776 Pa. Laws 11 (directing militia officers to disarm "non-associators"), Act of May 5, 1777, ch. 3, in 9 Hening's Statutes at Large 281, 281–82 (1821) (requiring loyalty oaths), An Act to Prohibit the Selling of Guns, Gunpowder, or Other Warlike Stores to the Indians, § 1, 1763 Pa. Laws 319 (1763) (prohibiting the sale of firearms to Native Americans), *and* An Act Prohibiting the Trading with Indians, § 2, in Nathaniel Pope, Laws of the Territory of Illinois (1815) (prohibiting the trading of firearms and other hunting articles to Native Americans in 1813).  Copies of these regulations are attached as exhibits to this response and are available electronically at: https://firearmslaw.duke.edu/repository/search-the-repository/  (last accessed September 29, 2023).  Notably, disarmament of groups based upon protected characteristics would violate American law today, but such laws may provide context on how early Americans understood the reach of the Second Amendment.

Jones misconstrues *Bruen* to set a shifting cascade of tests for modern regulations. [Doc. 30, 23, PageID.138].  *Bruen* set a single standard for historical comparisons that requires a reasonable comparator, not a twin.  142 S. Ct. at 2132–33.  Jones also incorrectly frames felon possession as a problem that has persisted in the same fashion since the 18th century.  [Doc. 30, 23, PageID.138].  As set out above, governments traditionally achieved disarmament through more severe and comprehensive sanctions.

Jones's attempted comparison to colonial militia statutes is inapt for similar reasons. [*Id.* at 26–28]. The comparison presupposes that felons frequently reentered civil life and joined militias. The historical evidence on punishment contradicts that suggestion. Regardless, disarmament is a similar sanction to the traditional punishments that legislatures could impose for felony offenses.

Finally, Jones asserts that this Court should ignore the many laws that disarmed dangerous or unvirtuous individuals. [*Id.* at 33–34, PageID.148–49]. He points out that these laws were insufficient in *Bruen*. [*Id.*]. Jones fatally ignores, however, that the *Bruen* Court confronted a much different regulation. The New York scheme in *Bruen* targeted law-abiding citizens. 142 S. Ct. at 2156. Section 922(g)(1) affects only convicted felons. *Bruen* did not categorically exclude such laws as valid comparators. It merely recognized that such targeted restrictions did not compare to the broader New York regime.

To sum up, § 922(g)(1) remains valid. The Eleventh Circuit upheld its constitutionality in *Rozier*, and *Rozier* is still good law. In addition, § 922(g)(1) is consistent with the Second Amendment. *Bruen* did not extend beyond law-abiding citizens. Section 922(g)(1) also easily satisfies the *Bruen* analysis. Thus, this Court should deny Jones's motion as to § 922(g)(1).

### B. Congress may bar the Possession of a Firearm to Carry out Crimes.

Next, Congress may impose criminal penalties for those individuals who possess firearms to carry out crimes. To that end, Congress has established penalties for those

12

who possess, brandish, or discharge firearms "during and in relation" to or in furtherance of a crime of violence or drug trafficking crime. 18 U.S.C. § 924(c)(1)(A). Relevant here, higher penalties apply for machineguns. *Id.* at § 924(c)(1)(B)(ii).

As an initial matter, *Bruen*'s analysis does not apply to § 924(c)(1)(B) for a multitude of reasons. Section 924(c)(1)(B) does not impact a citizen's ability to carry a firearm for purposes of armed self-defense. On the contrary, it criminalizes the carrying of a firearm to carry out certain serious crimes. The Second Amendment protects self-defense, not criminal activity. *See Bruen*, 142 S. Ct. at 2133 (recognizing the core purpose of the Second Amendment). Congress targeted criminal activity, not lawful self-defense, when it passed § 924(c)(1)(B).

Alternatively, § 924(c) easily passes *Bruen* scrutiny. *See United States v. Ingram*, 623 F. Supp. 3d 660, 664 (D.S.C. 2022). The same comparators that the United States identified as to § 922(g) also apply here. *Id.* Early American cases provide support of the punishment of offenders who carry firearms to further criminal activity. *State v. Huntly*, 3 Ired. 418 (N.C. 1843) (addressing North Carolina's laws on the use of firearms to terrorize the people). The *Bruen* Court recognized these cases but contrasted them with restrictions on the peaceable possession of firearms. 142 S. Ct. at 2145–46. Section 924(c)(1)(B) regulates criminal activity. Thus, it fits within the mold of these early statutes because it addresses unlawful actions, not peaceable uses. *See Orrego Goez v. United States*, - - - F. Supp. 3d - - - -, No. 22-23962-CIV-ALTMAN, 2023 WL 2045970,

13

at *5 (S.D. Fla. Feb. 16, 2023) (concluding that § 924(c) is "consistent with historical practice and precedent"), *and United States v. Garrett*, - - - F. Supp. 3d - - - -, No. 18 CR 880, 2023 WL 157961, at *3 (N.D. Ill. Jan. 11, 2023) (collecting authorities that have rejected *Bruen* challenges to § 924(c)).

Jones acknowledges that § 924(c) pertains only to the "targeted carrying" of a firearm. [Doc. 30, 38, PageID.153]. Nonetheless, he contends that it still regulated protected activity. As set out above, the Second Amendment does not protect a criminal's right to use a gun to commit a crime. Section 924(c) is valid.

    **C.**    **Congress may Prohibit the Possession of Unregistered Firearms.**

Finally, Congress may prohibit the possession of unregistered firearms. For certain firearms, Congress has prohibited the receipt or possession of a firearm that is "not registered to him in the National Firearms Registration and Transfer Record[.]" 26 U.S.C. § 5861(d). Section 5861(d) is constitutional.

The Supreme Court has upheld a prior codification of a similar firearm registration statute. *United States v. Miller*, 307 U.S. 174, 175, 183 (1939). *Heller* did not overrule *Miller*. Notably, the Eleventh Circuit upheld the application of § 5861(d) to unregistered pipe bombs in a post-*Heller* decision. *United States v. Tagg*, 572 F.3d 1320, 1325–27 (11th Cir. 2009). As the *Tagg* Court put it, "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 1326. The same can be said of Glock switches.

Section 5861(d) does not trigger *Bruen* scrutiny because it does not regulate protected Second Amendment activity. It merely requires the registration of certain firearms that often may be used for criminal purposes. *United States v. Holton*, 639 F. Supp. 3d 704, 709 (N.D. Tex. 2022) (concluding that § 5861(d) does not "regulate protected conduct under the Second Amendment"). Even if it did, the application of § 5861(d) to Jones's Glock switch satisfies *Bruen* because Glock switches are dangerous devices. Traditional laws on unusual firearms did not support the broad regime at issue in *Bruen*, but they provide ample support for the application of § 5861(d) to Glock switches. Section 5861(d) facially is constitutional.

## IV.  Conclusion

Congress lawfully may disarm convicted felons, prohibit the possession of guns in furtherance of crimes, and require the registration of Glock switches. Jones's firearm charges are constitutional. This Court should deny Jones's motion to dismiss these charges from his indictment.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY
By:

*/s/ Scott A. Gray*
Scott A. Gray
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama  36602

Telephone: (251) 441-5845
Fax: (251) 441-5131