## IN THE UNITED STATES DISTRICT COURT FOR THE

### SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **vs.** | | **CRIMINAL NO.  23-00126-TFM** |
| | * | |
| **Hassan Jones** | * | |
| Defendant. | | |

### Reply to Government's Response to Motion to Dismiss

### I.        __Introduction__

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), the Supreme Court clarified that Second Amendment challenges turn on an evaluation of text and history *alone*. The Court set forth a strict two-part "text and history" framework for evaluating Second Amendment claims going forward, *id*. at 2127, and it rejected the traditional "means-end" scrutiny approach to such claims applied by the courts of appeals in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008). In its responsive brief to Mr. Jones's motion to dismiss, the government conflates the two parts of the *Bruen* analysis by relying on historical references to define the Second Amendment's plain text; relies on *dicta* from *Heller*; urges this Court to apply precedent that is inconsistent with *Bruen*; and fails to show § 922(g)(1) is consistent with America's tradition of firearms regulation.

The Government claims that the Second Amendment only protects law abiding citizens. Tellingly, there is nothing within the plain text of the Amendment that makes even an oblique reference to the phrase "law-abiding", which would

have been extremely simple to include if the drafters of the Amendment had wished to do so.

Instead, the Government is forced to perform several intellectual back handsprings to conclude that the text of the Second Amendment is actually secondary to the text of the English Declaration of Rights. The Government misreads *Heller*.

Governments do not create rights, rather, rights exist naturally, and individuals form governments in an attempt to protect those rights. The English government failed to do so, so the Founding Fathers killed a bunch of agents of the English government and set up a new one, the United States government. *Heller* itself discussed how the Crown's violation of this individual right to bear arms was a cited example of a grievance that let up to the American Revolution.

## II.   <u>**The Second Amendment protects the rights of "the People," not merely law-abiding people.**</u>

Rather than arguing that felons are not among "the people," the government makes a new quasi-textual argument that the Second Amendment codified a pre-existing right that was historically understood to be limited to law-abiding people and that this "law-abiding qualification" arises from three sources: (1) the phrase "shall not be infringed" in the Second Amendment, (2) the English Declaration of Rights, and (3) dicta in *Heller* and *Bruen*. Gov't Br. at 3-8. This argument is wrong for four reasons.

First, when the Supreme Court did the "plain text" analysis in *Bruen's* step one, it considered only three textual elements: (1) "the people," (2) "Arms," and

(3) "keep and bear." 142 S.Ct. at 2134. It did not analyze what the phrase "shall not be infringed" meant because that phrase does no independent work. Courts applying *Bruen* similarly should limit themselves to three questions: Is the defendant among "the people"? Is the firearm in question an "Arm"? And does the defendant's conduct amount to "keeping and bearing"? If the answer to all three questions is "yes," then the defendant wins at step one and you move to step two, without analyzing what "shall not be infringed" means. *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023)("In alignment with *Heller*, [*Bruen*] requires a textual analysis, determining whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is '"in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment."); *United States v. Avila*, No. CV-22-CR-224-WJM-1, 2023 WL 3305934, at *4 & n.1 (D. Colo. May 8, 2023)(same; "Each of these questions address interpretative issues relating to different 'textual elements'–'the people,' 'Arms,' and 'keep and bear,' respectively–of what the Supreme Court calls the Second Amendment's 'operative clause.'").

Second, the government's argument makes a mess of the *Bruen* framework. The place to conduct a historical inquiry is at *Bruen's* step two, not step one. If step one entailed doing a historical analysis, then step two would be redundant and unnecessary. The government is trying to smuggle history into step one, where the test is less demanding and it can more easily rely on generalized, unrepresentative history that purportedly shows lots of restrictions on the right to keep and bear

arms. That is the sort of free-floating, armchair-historian approach that *Bruen* step two forbids. *NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) NRA v. Bondi, __ F.4th __, 2023 U.S. App. LEXIS 17960 (July 14, 2023)

Third, the English Declaration of Rights does not support the government's argument. It states "the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law." English Declaration of Rights, https://avalon.law.yale.edu/17th_century/england.asp. The government interprets this language to mean that our English forebears "did not perceive the Declaration of Rights to stand in the way of regulations on persons the government deemed to be criminal actors," specifically Catholics. Gov't Br. at 11-12. Even assuming that is the best interpretation, it is irrelevant to the Second Amendment, whose text contains neither of those restrictions, much less a restriction on felons' firearm possession. See *Kanter v. Barr*, 919 F.3d 437, 457 n.5 (7th Cir. 2019)(Barrett, J., dissenting)("[T]he right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights."). The Founders were all well familiar with this text, and they chose not to use it verbatim. Instead of "subjects which are Protestants," they said "the People" without *any* qualifiers. Incidentally, they also left out any language similar to "as allowed by law." Moreover, in *Bruen*, the Supreme Court warned courts to act "with care" when looking to pre-1791 firearms regulations (specifically "ancient" and "obsolete" English regulations) because "linguistic and legal conventions" may have changed. 142 S.Ct. at 2131-32, 2136.

Fourth, the language the government relies on from *Heller* and Bruen allegedly limiting the scope of the Second Amendment to "law-abiding, responsible citizens" and preserving "longstanding prohibitions on the possession of firearms by felons," is dicta.

### III.    <u>The *Heller* dicta is neither binding nor persuasive.</u>

Justice Thomas, who authored the majority opinion in *Bruen*, rightly understood those statements from *Heller* as *dicta*, *see Voisine v. United States*, 579 U.S. 686, 715 (2016)(Thomas, J., dissenting on other grounds)(describing *Heller*'s discussion of felon-disarmament laws as "dicta"), and only three members of the Supreme Court (in concurrences) continued to cite *Heller*'s "longstanding prohibition" *dicta* in *Bruen*. The majority of the Court found that *dicta* irrelevant for good reason.

Even before *Bruen*, many lower courts had agreed that the "longstanding prohibition" language in *Heller* was *dicta*. *See*, *e.g.*, *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010)(characterizing that language in *Heller* as *dicta*); *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 686-87 (6th Cir. 2015)(same; refusing to give that "dictum" "conclusive effect" foreclosing § 922(g)(4) from constitutional scrutiny); *see also United States v. Williams*, 616 F.3df 685, 692 (7th Cir. 2010)(finding *Heller*'s "presumptively lawful" language in footnote 26, following the "longstanding prohibitions" passage, was *dicta*).

Post-*Bruen*, courts have continued to recognize that the *Heller* language is *dicta*. *See Range*, 69 F.4th at 101 ("[T]he criminal histories of the plaintiffs in

*Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were *dicta*."); *United States v. Quiroz*, 629 F.Supp.3d 511, 518 (W.D.Tex. 2022)(holding a problem with the government's argument "is that *Heller*'s endorsement of felon-in-possession laws was in *dicta*"); *United States v. Ingram*, 623 F.Supp.3d 660, 663 (D.S.C. 2022)(acknowledging *Heller*'s statements that the right secured by the Second Amendment was "not unlimited" and that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felon" was *dicta*).

The Eleventh Circuit has continually emphasized, and endeavored to clarify, the distinction between the holding of a case and *dicta*. *See United States v. Kaley*, 579 F.3d 1246, 1253 n. 10 (11th Cir. 2009)("dicta is defined as those portions of an opinion that are not necessary to deciding the case then before us"). While the "holding" of a case comprises both its "result" and "those portions of the opinion necessary to that result," *id.*, a prior case's "holding" "can reach only as far as the facts and circumstances presented in the case which produced that decision." *United States v. Caraball-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017)(citations omitted).

Pursuant to this framework, there should be no question that the "longstanding prohibition" language in *Heller* was non-binding *dicta*. The issue of a blanket ban on the possession of firearms by felons was not part of the issue raised or resolved by the Supreme Court. Nor was it necessary to the Court's ultimate holding.

Undoubtedly "*dicta* from the Supreme Court is not something to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11ᵗʰ Cir. 2006). But that rule only applies where the Supreme Court *dicta* is "well thought out, thoroughly reasoned, and [a] carefully articulated analysis." *Id.*; *see also Hengle v. Treppa*, 19 F.4th 324, 346-47 (4ᵗʰ Cir. 2021)(Supreme Court *dicta* is entitled to great weight only where the Court's opinion engaged in an "extended discussion" of an issue, not a discussion that was "peripheral" or so cursory as to suggest that the Court gave less than "full and careful consideration to the matter;" the issue was "important, if not essential to the Court's analysis," and the *dicta* is "recent and not enfeebled by later statement").

The Fourth Circuit has rightly declined to follow Supreme Court *dicta* that was "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4ᵗʰ Cir. 2008); *see also id.* at 283 (refusing to "afford[] talismanic effect" to unexplained Supreme Court *dicta*). And the Eleventh Circuit has taken a similarly circumspect approach, focusing on the level of analysis in the *dicta. Compare Reynolds v. Behrman Capital IV L.P.*, 988 F.3d 1314, 1322 (11th Cir. 2021)("Giving the Supreme Court's *dicta* the respect and consideration it is due ... we choose to go in a different direction.") *with Schwab*, 451 F.3d at 1325 (following Supreme Court *dicta* because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of *dicta*").

*Heller*'s "longstanding prohibitions" *dicta* is precisely the kind of Supreme Court *dicta unentitled* to "talismanic effect." It was "unaccompanied by any

analysis," and "peripheral" to the question at issue. The Court provided no "extended discussion" on the point, and "never actually addressed the historical pedigree" of felon-disarmament laws. *Kanter*, 919 F.3d at 445 (Barrett, J., dissenting). To the contrary, the Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] *not* undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626 (emphasis added). In other words, the *Heller* Court did *not* claim that it had surveyed the relevant history and discovered a tradition of felon-disarmament laws dating back to the Founding era. It simply asserted such laws were "longstanding" and therefore presumptively lawful, "without any reasoning or explanation." Adam Winkler, *Heller's Catch-22*, 56 U.C.L.A. Law Rev. 1151, 1567 (2009); *see also United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons."). This Court should be "reluctant to place more weight on these passing references than the [Supreme] Court itself did." *Kanter*, 919 F.3d at 445 (quoting *United States v. Mesa-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015)).

That is particularly true here, since felon-disarmament laws are actually *not* "longstanding" in the sense that *Bruen* would use that term. Indisputably, no American jurisdiction enacted such a law until the twentieth century. Thus, *Heller*'s discussion of "longstanding" felon-disarmament laws is not simply *dicta*; it is *dicta*

based on a factually unsupportable premise. Where a firearm regulation suffers from a "lack of historical pedigree," it is "particularly proper" to "refus[e] to give *Heller* conclusive effect." *Tyler*, 837 F.3d at 687.

Other parts of *Heller* confirm that the *dicta* the government relies on here cannot control. Notably, Justice Breyer, dissenting in *Heller*, criticized the reference to longstanding felon-disarmament laws as "ipse dixit," underscoring that the majority had "fail[ed] to cite any colonial analogues" to such statutes." 554 U.S. at 721-22 (Breyer, J., dissenting). The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. That rejoinder suggests that the *Heller* majority assumed felons can be deprived of the Second Amendment right *if* that deprivation were consistent with history and tradition (an issue it expressly did not consider). The Court's allusion to "expounding on the historical justification" for felon-disarmament laws would make no sense if *Heller* had held felons could be disarmed regardless of whether history supported that exclusion. Crucially, the *Heller* majority stressed that it had *not* canvassed the historical record and made a determination, one way or the other, about whether that record supported felon-disarmament laws. 554 U.S. at 626 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment").

If there was any doubt that the "longstanding prohibition" language was nonbinding *dicta*, *Bruen* resolved that doubt in two ways. First, *Bruen* reaffirmed

that *Heller* did *not* purport to settle any questions beyond those necessary to resolve the petitioners' claim. 142 S.Ct. at 2128 (noting *Heller* described the Second Amendment right as "not unlimited," but adding, "That said, we cautioned we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban").

Second, in the sentence before the Court's reference to "longstanding prohibitions" on felons' possession of firearms, the *Heller* Court wrote that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626. Fourteen years later, the Court in *Bruen* confronted a challenge to a New York law severely restricting the concealed carry of firearms in public. 142 S. Ct. at 2122-23. If *Heller*'s casual description of concealed-carry bans as constitutional were dispositive, *Bruen* would have been an easy case: the Court would simply have deferred to *Heller*'s prior approval of such laws and upheld New York's statute on that basis. But of course, that is not what the Court did.

The Court instead undertook an exhaustive historical survey of the law governing concealed carry, from medieval England up to late-19th-century America. *Id.* at 2135-56. And "[a]t the end of th[at] long journey through the Anglo-American history of public carry," *id.* at 2156, the Court reached a conclusion different from its offhand remark in *Heller*, holding that laws burdening concealed carry are *un*constitutional, at least where the state also forbids open carry. *See id.* at 2144-47,

2150. In short, *Bruen*'s contradiction of *Heller*'s dicta regarding the permissibility of concealed-carry bans shows that *Heller*'s passing statement on felon-disarmament laws is likewise not determinative.

*Bruen*'s lesson for § 922(g)(1) is clear. Rather than treating *Heller*'s "longstanding prohibitions" passage as dispositive, lower courts must investigate the historical record to determine whether felon-disarmament laws are consistent with the Second Amendment. And indeed, the need for historical inquiry is even greater with respect to felon-disarmament laws than it was with respect to concealed-carry bans in *Bruen*. *Heller* seemingly blessed the constitutionality of concealed-carry prohibitions by citing four sources—two cases and two treatises. 554 U.S. at 626. But for felon-disarmament laws, by contrast, *Heller* cited nothing at all. *Id.* at 626-27. If the four sources supporting concealed-carry bans were insufficient to stave off a fuller historical analysis in *Bruen*, then it necessarily follows that *Heller*'s cursory approval of felon-disarmament laws does not end the Second Amendment inquiry.

The passing references to law-abiding citizens in *Bruen* do not override this analysis and suggest, by negative implication, that the Second Amendment "right" excludes the non-law-abiding, which was not a question at issue in either case. Nowhere did the *Bruen* Court say Second Amendment rights are *limited* to law-abiding citizens. *Bruen* had no occasion to decide whether the Second Amendment is limited to the law-abiding, because "in the pleadings below" the petitioners described themselves as "law-abiding, adult citizens." 142 S. Ct. at 2124-25. Thus,

the only question in *Bruen* involved application of New York's proper-cause requirement to law-abiding citizens. The Court did not go—and could not have gone—any further. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm.").

*Bruen* confirms that it is a mistake to read the "law-abiding citizen" language in either *Heller* or *Bruen* as a limitation on the Second Amendment. In the same way *Heller's* description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other places, *Bruen's* mention of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other people.

Finally, more generally, lower courts do not read Supreme Court opinions through a process of negative implication. The Supreme Court has said, for instance, that "the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). No lower court would conclude from this statement that the First Amendment protects *only* "political" speech, and an inference-by-omission is no more warranted in the Second Amendment context. *See Bruen*, 142 S. Ct. at 2156 (cautioning that right to bear arms "is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.").

IV.   **This Court should reject the Government's invitation to not follow the *Bruen* framework strictly.**

The Government claims that "It makes little sense to apply such a presumption [of unconstitutionality]." On the contrary, that is exactly what the

Supreme Court demanded that we do in *Bruen*. Whether or not it makes sense is neither here nor there, it is the law of the land. Additionally, the reference to sensitive spaces is a red herring—that is not the issue that is presently before this Court.

The Government's argues that the holding of *Bruen* should not be followed because a flood of constitutional litigation will result. So be it. The flood has arrived. Fortunately, there is an entire legal apparatus where some very fine legal minds are work hard every day to resolve these issues. It would be a shame for such talent to go to waste.

The Government, in a moment of clarity, successfully differentiates Mr. Jones's case from *Bruen: "Bruen* involved general rights of gun access for law-abiding citizens. Conversely, Jones has multiple felony convictions." That is the only salient difference—both cases involve the criminalization of an individual's right to possess a handgun for self-defense. The question before the *Bruen* court was whether New York could disarm a law-abiding citizen from possessing a handgun in public. The Supreme Court established the proper means of addressing the question, and it concluded that New York's regulation did not pass constitutional muster. The question before this Court is whether the United States can Constitutionally disarm a person solely on account of a prior felony conviction. This Court is bound to apply the same methodology, and it will come to the inevitable conclusion that the United States may do no such thing.

The Government's position is if a person drives twenty-six miles per hour on Saint Louis Street in Mobile Alabama—which is a violation of the law—then that person immediately and permanently forfeits a Constitutionally protected individual right. They reason that even though the Second Amendment does not actually say so, it protects a fundamental individual right that only exists for law-abiders. This proposition is absurd. Rights do not only belong to those who strictly toe the government's line.

Three out of the ten Amendments in the Bill of Rights are specifically for people that are criminally accused. The Founders were well aware of the tendency for governments to use criminal law as a means to oppress the People, and as demonstrated by their sanctification of the protection of rights of criminals and the criminally accused to the highest order. They would not have understood a fundamental right to be so strictly tied to obedience to the government.

## V.   *Bruen* abrogated *Rozier.*

The Government next tries to argue that *Rozier* has already decided the issue and is still good law. Again, Mr. Jones anticipated this and addressed the Government's points in the Motion to Dismiss. *Rozier* did not apply the historical and textual standard required post-*Bruen*. *Rozier* could not have cited "*Heller's* analysis of the prohibition and the established principle that a felony conviction affects an individual's rights," because the *Heller* court undertook no such inquiry. Even if *Rozier* did not reach a "means-end" analysis step, it certainly did not follow the analytical steps subsequently laid out by *Bruen*.

*Bruen* abrogated the entire body of Second Amendment caselaw in this Circuit that had developed after *Heller*, including *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)(per curiam). *Bruen* did far more than "tweak the test," as the government claims. Gov't Br. at 9. *Bruen* upended the way courts approach Second Amendment litigation and changed the analysis entirely by "ma[king] the constitutional standard endorsed in *Heller* more explicit," 142 S.Ct. at 2134, by mandating that text and history be considered sequentially, and by explaining the rules and burdens at each stage.

Regarding *Rozier*, *Bruen* rejected the threshold analysis applied in that case, which did not focus at all on the plain text of the Second Amendment, but rather asked simply whether the defendant was "*qualified* to possess a firearm." 598 F.3d at 770-01. *Rozier* held that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment," *id*. at 771, without considering *Heller*'s specific determination that reference to "the people" in the Second Amendment "unambiguously refers" to "all Americans," 554 U.S. at 579-81. Then *Rozier* conflated *Bruen*'s two steps by injecting history into what should have been a purely textual analysis. The *Rozier* panel concluded that the defendant was not qualified to possess a firearm because of *Heller*'s *dicta* about "longstanding prohibitions on the possession of firearms by felons." 598 F.3d at 771.

The government attempts to lessen *Bruen*'s impact on *Rozier*'s analysis by arguing that *Rozier* did not "depend on" the means-end scrutiny rejected in *Bruen*, Gov't Br. at 22, even though *Rozier* uses means-end scrutiny language when it

speaks of "weigh[ing]" a defendant's Second Amendment right, *see* 598 F.3d at 771. Also, Eleventh Circuit cases decided after *Rozier* clearly articulated a means-end scrutiny test for Second Amendment claims. *See*, e.g., *GeorgiaCarry.Org, Inc., v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012).

Whether *Rozier* actually depended on means-end scrutiny is almost beside the point because, whatever standard *Rozier* applied, it was not the *Bruen* standard. As a result, *Rozier* is not good law after *Bruen. See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008)(abrogation of precedent may occur where an intervening Supreme Court decision "clearly set[s] forth a new standard").

Additionally, as noted in the Motion to Dismiss, *Rozier*'s proposition that individuals must somehow be "qualified" before their rights are protected by the constitution is preposterous. Where in the Constitution does it lay out the "qualification" for individual rights? What other individual rights have similar "qualification" requirements? If the Government can simply take an end-run around the Constitution by deeming anybody that it does not like as "unqualified" to enjoy its protection, then what value does Constitutional protection actually have?

VI. <u>**The government cannot meet its burden of showing that §922(g)1 is consistent with the Nation's historical tradition of firearms regulation.**</u>

Finally, the Government makes an attempt to meet its burden under *Bruen,* and, predictably, fails to do so. It bears noting that the Government has not consulted with an expert historian, and cites legal, rather than historical, sources. The judges that wrote these legal opinions are no doubt qualified legal minds, but

they are not trained historians. To the best of Mr. Jones's knowledge, the Government has never once consulted a historian in *any* litigation surrounding the Second Amendment, even though the Supreme Court in *Bruen* places such a burden squarely on the Government's shoulders. Its reluctance to engage with the history is understandable because the historical facts do not support the Government's position.

## A. __The government applies the wrong legal standard__.

Bruen requires answering a threshold question: Does the "challenged regulation address[] a general societal problem that has persisted since the 18th century," or does it address "unprecedented" societal concerns that "were unimaginable at the founding"? 142 S.Ct. at 2131-32. If the former, the government must establish a historical tradition of "distinctly similar" regulations. Id. at 2131. This "relatively simple" and "straightforward historical inquiry" requires the government to identify a tradition of founding-era statutes that are nearly the same as the challenged regulation. Id. at 2131-32. By contrast, the government can identify a tradition of "relevantly similar" historical analogues if, but only if, the challenged statute targets a problem unfamiliar to the founding generation. Id. at 2132.

As a preliminary matter, as discussed in the Motion to Dismiss, the "ubiquity of capital punishment" at the time of the drafting of the Second Amendment referenced on page twelve of the Government's Brief is not historically accurate. "At the Old Bailey, London's chief criminal court, more than two-thirds of all felons from 1718 to 1775 were ordered for exile. By contrast, only about one in every six

received the death penalty."[1] Of those sentenced to death, through a variety of pardons, commutations, and other means, "less than a fifth of death sentences were actually carried out." [2]

Following the Transportation Act of 1718, tens of thousands of Colonial Era convicted felons were subjected to penal transportation, including to the American Colonies. "Between 1700 and 1775, a total of 585,800 immigrants arrived in the 13 colonies from all over the world. About 52,200 of these immigrants were convicts and prisoners (9%)."[3] To a large degree, the peopling of what would become the United States of America was carried out by convicted felons transported against their will.

Domestically convicted felons were also seldomly executed. While there were indeed numerous offenses punishable by death, "[t]he number of executions was relatively low in the colonial period."[4] The realities of colonial America's task of taming a wilderness in the face of indigenous resistance demanded the participation of every able-bodied person, so governments would not have lightly destroyed their human resources. Additionally, religious ideas, particularly those of the Quakers, were already anti-capital punishment in the 18th century. The New Jersey colony

---

[1] Ekirch, A. Roger. "Bound for America: A Profile of British Convicts Transported to the Colonies, 1718-1775*." The William and Mary Quarterly*, vol. 42, no. 2, 1985, pp. 184–200. JSTOR, https://doi.org/10.2307/1920427. Accessed 21 Sept. 2023.
[2] Tim Hitchcock, Robert Shoemaker, Clive Emsley, Sharon Howard and Jamie McLaughlin, et al., The Old Bailey Proceedings Online, 1674-1913 (www.oldbaileyonline.org, version 7.0, 24 March 2012).
[3] Vaver, Anthony. "Bound with an Iron Chain: The Untold Story of How the British Transported 50,000 Convicts to Colonial America." Pickpocket Publishing (June 30, 2011) p.7.
[4] Gottlieb, Gabriele. "Theatre of Death: Capital Punishment in Early America, 1750-1800." University of Pittsburgh 2005.

had no death penalty, and Pennsylvania reserved it only for murder and treason.[5] "Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,'" and "while the term 'felony' was once 'very strongly connected with capital punishment,' that was no longer true" by the time the Constitution was ratified. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); accord *Folajtar v. Att'y Gen.*, 980 F.3d 897, 920 (3d Cir. 2020)(Bibas, J., dissenting)(same).

Clearly, the Founders were surrounded by large numbers of still-living convicted felons. It is indisputable that firearms were commonplace in early America. The social issue of those people possession those firearms is one that the Founders would have been perfectly familiar with. The Government's contention that the concept of armed living people with felony convictions were unheard of in the eighteenth century is entirely without merit.

The government denies that Bruen establishes this dual-track review and tries to avoid application of the "distinctly similar" test by arguing that (1) it "need only identify 'a well-established and representative historical analogue,'" not "a historical twin," and (2) disarming felons was not a problem in the early Republic because felons were subjected to "literal or civil death" for their crimes. Gov't Br. at 10-11. It then tries to satisfy the "relevantly similar" test by sh owing that § 922(g)(1) is similar to "traditional punishments for felons" and "other persons deemed to be disloyal, unvirtuous, or otherwise threatening to the state." Id. at 10-20.

---

[5] Reggie, Michael H. (1997). "History of the Death Penalty". In Laura E. Randa (ed.). Society's Final Solution: A History and Discussion of the Death Penalty (online version). University Press of America, Inc.

With this line of argument, the government has implicitly conceded that it cannot satisfy the proper "distinctly similar" test. That should end the inquiry.

**B. Even if the "relevantly similar" test applies (it does not), the government has failed to carry its burden.**

Assuming for sake of argument that the "relevantly similar" standard is available, the government still has failed to carry its burden. It points to two supposed traditions to support § 922(g)(1): (1) laws authorizing capital punishment and property forfeiture for felons and (2) laws disarming "unvirtuous" people. Gov't Br. at 10,11. Neither is sufficient.

The government contends that § 922(g)(1) is constitutional because disarmament bears "striking similarities to other punishments that felons typically faced." Id. at 11. After all, being prohibited from possessing a firearm under § 922(g)(1) is less of a burden than being executed or stripped of one's "lands and goods." Id. This comparison misunderstands the "metrics" of the "relevantly similar" test. 142 S.Ct. at 2133.

Under that test, courts ask "whether modern and historical regulations impose a comparable burden *on the right of armed self-defense.*" *Id.* (emphasis added). The relevant "burden" is the burden on the right to keep and bear arms–not some generalized, cumulative burden on any or all of the various legal interests a citizen possesses, such as his right to own property or his right to life. Thus the proper question is whether § 922(g)(1) and the government's felony-punishment laws burden the arms right to a "comparable" degree. The answer is no.

Section 922(g)(1) is a categorical, lifetime ban on possessing firearms. Under that statute, a felon may never possess a firearm again, even after completing his sentence. The forfeiture laws referenced by the government are different. Gov't Br. at 31. They generally provided that people convicted of certain felonies had to forfeit their "lands and goods," which presumably included their firearms, before entering prison. But nothing in those statutes prevented felons from acquiring new firearms upon release from prison. Besides, those statutes applied only to a small subset of felonies, whereas § 922(g)(1) covers almost all felonies. See 18 U.S.C. § 921(a)(20). Accordingly, § 922(g)(1) imposes a much more severe "burden on the right of armed self-defense" than do the government's "historical regulations." Bruen, 142 S.Ct. at 2133.

Similarly, those historical regulations and § 922(g)(1) are not "comparably justified" in terms of the burden they impose on the right to keep and bear arms. Id. Section 922(g)(1) is a preventive measure that disarms felons because Congress believes they would pose a danger to public safety if allowed to possess guns. By contrast, the government's historical regulations disarmed felons purely as punishment, for reasons having nothing to do with public safety. That those laws were not limited to firearms forfeiture, but instead reached all a defendant's property, demonstrates that they were not justified by a fear that felons' use of firearms would endanger public safety.

Mr. Jones anticipated that the Government would analogize disarmament with regulations depriving felons of civic rights, such as disenfranchisement laws.

As he has already explained, *Heller* and *Bruen* teach us that the Second Amendment protects an individual right, not a civic right.

Section 922(g)1 does not "sits neatly on top of…enduring historical lineage." Gov't brief at 15. There is no "enduring historical lineage" of permanent, categorical felon disarmament until the twentieth century. Any "lineage" that the government references can only be the vaguest and broadest tradition of governments defining and punishing crimes in general. Of course, governments, including those in the 1790's, absolutely had the power criminalize activities and define punishments for those crimes. What matters here, is that Founding era legislatures specifically chose *not* to enact laws like § 922(g)1.

The government's reliance on Founding-era laws disarming "unvirtuous" people operates at too high a level of generality because, contra *Bruen*, it deduces a broad principle (that "unvirtuous" people can be disarmed) by aggregating a small number of disparate and discrete regulations (laws disarming slaves, Native Americans, Catholics, and disloyal subjects) and then applies that principle in ways untethered to the historical record. The unvirtuous category is also impermissibly malleable and applying the label would plunge courts back into the means-end balancing from which *Bruen* delivered them.

The government's "unvirtuous" argument proceeds in three steps: (1) cite a handful of founding-era laws disarming Catholics, slaves, Native Americans, and people who refused to swear a loyalty oath, (2) isolate a characteristic that supposedly unites these groups (unvirtuousness), and (3) wield that label to disarm

any group that a modern legislature considers unvirtuous, even if that group was never disarmed at the founding. But this is precisely the gambit Bruen rejects.

The label "unvirtuous" is amorphous and manipulable. It lacks a limiting principle and thus is an unsuitable metric for deciding who enjoys Second Amendment rights. A district court made a similar point in a recent Second Amendment challenge to 18 U.S.C. § 922(g)(3), which prohibits firearm possession by an "unlawful user" of a controlled substance. *United States v. Harrison*, 2023 WL 1771138, at *1 (W.D. Okla. Feb. 3, 2023). The government argued that § 922(g)(3) was analogous to historical laws disarming "'lunatics," since "drug users, like the mentally ill, have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id*. at *19. But that argument, the court observed, "appears to have no limit"; it could be used to justify disarming a seemingly limitless number of other groups who supposedly "have difficulty exercising self-control," *e.g.*, people suffering from "autism, attention deficit disorder, [or] nicotine dependence." *Id*. The government's approach, the court wrote, is unmoored from the historical record and would invest legislatures with boundless power to deny firearms to virtually any group they wished. *Id*. at *19 n.134.

Finally, there is no principled way to apply the "unvirtuous" standard without resurrecting means-end balancing. Given the elasticity of a term like "unvirtuous," the inevitable result would be "judicial deference to legislative interest balancing," which is "not" "appropriate" in the Second Amendment context. *Bruen*, 142 S.Ct. at 2131.

Even putting aside these conceptual problems with the "unvirtuous" category, the historical regulations cited by the government do not demonstrate that § 922(g)(1) is consistent with America's tradition of firearms regulation. The government relies on what it calls the "'dominant understanding' of the firearm right during early America," which it gleans from a single law review article that pre-dates *Bruen* by two decades. Gov't Br. At 18. Such vague allusions to a "dominant understanding" not backed up by citations to specific statutes do not satisfy the government's heavy burden under *Bruen* step two. 142 S.Ct. at 2133. The only actual laws the government cites are one 17th-century English law relating to Catholics and a handful of laws relating to "non-associators," loyalty oaths, and Native Americans. *Id.*

Nor were these 17th- and 18th-century laws "comparably justified." Whereas § 922(g)(1) is intended to prevent interpersonal violence, the "purpose" of the Catholic-disarmament laws was "to preclude armed insurrections" and rebellion by a group considered "disloyal and seditious." *Id.* at 258-60, 263. Moreover, this English law does not amount to a "well-established and representative historical" tradition. *Bruen*, 142 S.Ct. at 2133. The *Bruen* Court "doubt[ed]" that regulations from three out of thirteen colonies were sufficient to establish a historical tradition. *Id.* at 2142. It necessarily follows that a single law from 17th-century England is inadequate.

The government claims that "A felony conviction evinces a disregard for social order and a breach of the public trust that is akin to disloyalty or

dangerousness that subjected classes of persons to firearm regulations." Gov't Br. at 19. That is a blatant false equivalency. Put simply, committing a sundry crime is not the same as committing an act of violent overthrow of the government. The Constitution illustrates the vast gulf between treason and ordinary crimes, as it heightens the burden for a conviction of treason: "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court. U.S. Const. Art. III. § 3.

The government is then so bold as to claim that "Governments punish crimes to protect the public from breaches of the peace." Gov't Br. at 19. Sometime governments may in fact punish crimes to protect the public. But Governments also punish crimes for a variety of other reasons, some of which are malicious. The government's own citation says nothing about protecting the public, but rather protecting the sovereignty of the government. *Id.* The government, understandably, takes a rosy view of governments, but governments have undertaken such illustrious policies as the Great Leap Forward, the Congo Free State, and the Holodomor. The United States Government and the governments of the several states have themselves at times criminalized consensual gay sex, (Bowers v. Hardwick, 478 U.S. 186 (1986)), harboring escaped slaves (Fugitive Slave Law of 1850), and being a Native American living on his or her ancestral home (Indian Removal Act of 1830). Needless to say, not doing what the government tells you to is far from an automatic indicator that you are a dangerous or disloyal person.

The government points to "numerous early laws" banning gun ownership by Native Americans and the "disloyal," but it only cites five such laws. Gov't Br. at 18-19. The laws banning gun possession by Native Americans are distinguishable because Native Americans were not understood to be "a part of the 'political community' of persons protected by the Second Amendment," *Harrison*, 2023 WL 1771138, at *20. As a result, restrictions on their Second Amendment rights tell us nothing about the scope of arms-bearing permitted to those who were among "the people." *See Jimenez-Shilon*, 34 F.4th at 1047 ("Neither the Indian nor the slave was a citizen of the British colonies and, accordingly, neither was entitled to the rights of English subjects."). These laws also were not "comparably justified" relative to § 922(g)(1). *Bruen*, 142 S.Ct. at 2133. Like the Catholic-disarmament statutes, they were meant to neutralize "people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir.), *cert. granted*, 143 S.Ct. 2688 (2023); *see also* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994)(noting slave-disarmament laws were motivated by perceived "need for racial control").

Likewise, § 922(g)(1) and statutes disarming "those who would not participate in the American Revolution," "'non-associators,'" and people who would not make "loyalty oaths," Gov't Br. at 42, do not impose a "comparable burden" on the right to keep and bear arms. *Bruen*, 142 S.Ct. at 2133. People disarmed under loyalty statutes could regain the arms right at any time simply by swearing a

loyalty oath, *see* Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 157 (2007), whereas § 922(g)(1) defendants have no similar ability to restore their right to arms. And even when states took arms away from someone who refused the oath, that person was free to acquire new firearms, unlike a § 922(g)(1) defendant. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 724 (2009)(explaining loyalty statutes "did not technically prohibit recusants from acquiring new arms," since they "read more like forfeiture laws than disabilities").

Loyalty statutes also were not "comparably justified." *Bruen*, 142 S.Ct. at 2133. Unlike § 922(g)(1), which seeks to prevent interpersonal violence, the loyalty statutes were meant to neutralize those "considered dangerous to the *state*," *i.e.*, those who might rebel or otherwise undermine the stability of government because of their loyalty to Great Britain. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-07 (2004)(emphasis added); *see Greenlee*, 20 Wyo. L. Rev. At 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them.").

VII.   **The government's remaining arguments hold no water.**

The government makes a couple of other arguments that are unpersuasive. The government contends that § 922(g)(1) is analogous to historical laws that "excluded felons from participation in the political process." Gov't Br. at 32. However, *Heller* "expressly rejects the argument that the Second Amendment

protects a purely civic right," *i.e.*, a right that "requires citizens to act in a collective manner for distinctly public purposes." *Kanter*, 919 F.3d at 462-63 (Barrett, J., dissenting). *Heller* held the Second Amendment protects "an individual right unconnected with militia service," rather than a "collective" right that "may be exercised only through participation in some corporate body." 554 U.S. at 579, 605. Thus the right to bear arms is not a "civic" right, and laws excluding felons from exercising civic rights, such as voting, are irrelevant to the Second Amendment.

Finally, the government urges this court to not follow the Third Circuit's recent *en banc* decision in *Range*, 69 F.4th 96, which held that § 922(g)(1) is unconstitutional as-applied to a person convicted of making a false statement on a food stamp application. Gov't Br. at 21. It argues that *Range* is distinguishable because it involved only an as-applied constitutional challenge, not a facial one, and that *Range* was wrongly decided because it created a "regulatory straitjacket" that is "at odds with *Bruen*." *Id*.

To the contrary, the *Range* decision is persuasive, relevant authority. The Third Circuit applied a two-step analysis similar to the analysis Mr. Jones urges this court to apply, and the Third Circuit rejected arguments that are identical to arguments the government makes in Mr. Jones's case. 69 F.4th at 100-105. "At root," the Third Circuit wrote, "the Government's claim that only 'law-abiding citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people'" and gives "legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id*. at 103. And

the government's efforts to satisfy *Bruen*'s step two fail because "a law passed in 1961 . . . falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional rights," and the old status-based restrictions relied on by the government are "far too broad" and do not prove that a defendant "is part of a similar group today." *Id*. at 104.

That said, Mr. Jones disagrees with the Third Circuit's analysis in one respect. The *Range* opinion suggests that "[h]istorical tradition can be established by analogical reasoning" without regard to whether a court is applying the "distinctly similar" test to a historical regulation or the "relevantly similar" test to a more modern regulation. *Id*. at 103. This is incorrect. The government may resort to analogues only under the "relevantly similar" test.

18 U.S.C. § 922(g)1 is unconstitutional on its face. This Court should grant Mr. Jones's motion to dismiss.

Respectfully submitted,

/s/ Colin J. Fitzpatrick
COLIN J. FITZPATRICK
Assistant Federal Defender
Florida State Bar No: 1019998
Federal Defenders Organization, Inc.
11 N. Water Street, Suite 11290
Mobile, Alabama 36602
(251) 433-0910

CERTIFICATE OF SERVICE

I do hereby certify that I have electronically served a true and correct copy of the foregoing notice upon A.U.S.A., Elizabeth Stephens, on this      22nd      day of September 2023.

/s/ Colin J. Fitzpatrick

## IN THE UNITED STATES DISTRICT COURT FOR THE

### SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**UNITED STATES OF AMERICA**          \*

                                      \*

**vs.**                                             **CRIMINAL NO.  23-00138-TFM**

                                      \*

**Hassan Jones**                          \*
       **Defendant.**

### Reply to Government's Response to Motion to Dismiss

VIII.   **Introduction**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111

(2022), the Supreme Court clarified that Second Amendment challenges turn on an

evaluation of text and history *alone*. The Court set forth a strict two-part "text and

history" framework for evaluating Second Amendment claims going forward, *id*. at

2127, and it rejected the traditional "means-end" scrutiny approach to such claims

applied by the courts of appeals in the wake of *District of Columbia v. Heller*, 554

U.S. 570 (2008). In its responsive brief to Mr. Jones's motion to dismiss, the

government conflates the two parts of the *Bruen* analysis by relying on historical

references to define the Second Amendment's plain text; relies on *dicta* from *Heller*;

urges this Court to apply precedent that is inconsistent with *Bruen*; and fails to

show § 922(g)(1) is consistent with America's tradition of firearms regulation.

The Government claims that the Second Amendment only protects law abiding citizens. Tellingly, there is nothing within the plain text of the Amendment that makes even an oblique reference to the phrase "law-abiding", which would have been extremely simple to include if the drafters of the Amendment had wished to do so.

Instead, the Government is forced to perform several intellectual back handsprings to conclude that the text of the Second Amendment is actually secondary to the text of the English Declaration of Rights. The Government misreads *Heller*.

Governments do not create rights, rather, rights exist naturally, and individuals form governments in an attempt to protect those rights. The English government failed to do so, so the Founding Fathers killed a bunch of agents of the English government and set up a new one, the United States government. *Heller* itself discussed how the Crown's violation of this individual right to bear arms was a cited example of a grievance that let up to the American Revolution.

IX. <u>**The Second Amendment protects the rights of "the People," not merely law-abiding people.**</u>

Rather than arguing that felons are not among "the people," the government makes a new quasi-textual argument that the Second Amendment codified a pre-existing right that was historically understood to be limited to law-abiding people and that this "law-abiding qualification" arises from three sources: (1) the phrase "shall not be infringed" in the Second Amendment, (2) the English Declaration of

Rights, and (3) dicta in *Heller* and *Bruen*. Gov't Br. at 3-8. This argument is wrong for four reasons.

First, when the Supreme Court did the "plain text" analysis in *Bruen's* step one, it considered only three textual elements: (1) "the people," (2) "Arms," and (3) "keep and bear." 142 S.Ct. at 2134. It did not analyze what the phrase "shall not be infringed" meant because that phrase does no independent work. Courts applying *Bruen* similarly should limit themselves to three questions: Is the defendant among "the people"? Is the firearm in question an "Arm"? And does the defendant's conduct amount to "keeping and bearing"? If the answer to all three questions is "yes," then the defendant wins at step one and you move to step two, without analyzing what "shall not be infringed" means. *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023)("In alignment with *Heller*, [*Bruen*] requires a textual analysis, determining whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is '"in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment."); United States v. Avila, No. CV-22-CR-224-WJM-1, 2023 WL 3305934, at *4 & n.1 (D. Colo. May 8, 2023)(same; "Each of these questions address interpretative issues relating to different 'textual elements'–'the people,' 'Arms,' and 'keep and bear,' respectively–of what the Supreme Court calls the Second Amendment's 'operative clause.'").

Second, the government's argument makes a mess of the *Bruen* framework. The place to conduct a historical inquiry is at *Bruen's* step two, not step one. If step

one entailed doing a historical analysis, then step two would be redundant and unnecessary. The government is trying to smuggle history into step one, where the test is less demanding and it can more easily rely on generalized, unrepresentative history that purportedly shows lots of restrictions on the right to keep and bear arms. That is the sort of free-floating, armchair-historian approach that *Bruen* step two forbids. *NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) NRA v. Bondi, __ F.4th __, 2023 U.S. App. LEXIS 17960 (July 14, 2023)

Third, the English Declaration of Rights does not support the government's argument. It states "the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law." English Declaration of Rights, https://avalon.law.yale.edu/17th_century/england.asp. The government interprets this language to mean that our English forebears "did not perceive the Declaration of Rights to stand in the way of regulations on persons the government deemed to be criminal actors," specifically Catholics. Notably, it does not exclude felons, as the Government seems to imply. Gov't Br. at 7-8. Even assuming that is the best interpretation, it is irrelevant to the Second Amendment, whose text contains neither of those restrictions, much less a restriction on felons' firearm possession. See *Kanter v. Barr*, 919 F.3d 437, 457 n.5 (7th Cir. 2019)(Barrett, J., dissenting)("[T]he right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights."). The Founders were all well familiar with this text, and they chose not to use it verbatim. Instead of "subjects which are Protestants," they said "the People" without *any* qualifiers. Incidentally,

they also left out any language similar to "as allowed by law." Moreover, in *Bruen*, the Supreme Court warned courts to act "with care" when looking to pre-1791 firearms regulations (specifically "ancient" and "obsolete" English regulations) because "linguistic and legal conventions" may have changed. 142 S.Ct. at 2131-32, 2136.

Fourth, the language the government relies on from *Heller* and Bruen allegedly limiting the scope of the Second Amendment to "law-abiding, responsible citizens" and preserving "longstanding prohibitions on the possession of firearms by felons," is dicta.

### X.    <u>The *Heller* dicta is neither binding nor persuasive.</u>

Justice Thomas, who authored the majority opinion in *Bruen*, rightly understood those statements from *Heller* as *dicta, see Voisine v. United States*, 579 U.S. 686, 715 (2016)(Thomas, J., dissenting on other grounds)(describing *Heller*'s discussion of felon-disarmament laws as "dicta"), and only three members of the Supreme Court (in concurrences) continued to cite *Heller*'s "longstanding prohibition" *dicta* in *Bruen*. The majority of the Court found that *dicta* irrelevant for good reason.

Even before *Bruen*, many lower courts had agreed that the "longstanding prohibition" language in *Heller* was *dicta. See, e.g., United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010)(characterizing that language in *Heller* as *dicta*); *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 686-87 (6th Cir. 2015)(same; refusing to give that "dictum" "conclusive effect" foreclosing § 922(g)(4) from

constitutional scrutiny); *see also United States v. Williams*, 616 F.3df 685, 692 (7th Cir. 2010)(finding *Heller*'s "presumptively lawful" language in footnote 26, following the "longstanding prohibitions" passage, was *dicta*).

Post-*Bruen*, courts have continued to recognize that the *Heller* language is *dicta. See Range*, 69 F.4th at 101 ("[T]he criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were *dicta*."); *United States v. Quiroz*, 629 F.Supp.3d 511, 518 (W.D.Tex. 2022)(holding a problem with the government's argument "is that *Heller*'s endorsement of felon-in-possession laws was in *dicta*"); *United States v. Ingram*, 623 F.Supp.3d 660, 663 (D.S.C. 2022)(acknowledging *Heller*'s statements that the right secured by the Second Amendment was "not unlimited" and that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felon" was *dicta*).

The Eleventh Circuit has continually emphasized, and endeavored to clarify, the distinction between the holding of a case and *dicta. See United States v. Kaley*, 579 F.3d 1246, 1253 n. 10 (11th Cir. 2009)("dicta is defined as those portions of an opinion that are not necessary to deciding the case then before us"). While the "holding" of a case comprises both its "result" and "those portions of the opinion necessary to that result," *id.*, a prior case's "holding" "can reach only as far as the facts and circumstances presented in the case which produced that decision." *United States v. Caraball-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017)(citations omitted).

Pursuant to this framework, there should be no question that the "longstanding prohibition" language in *Heller* was non-binding *dicta*. The issue of a blanket ban on the possession of firearms by felons was not part of the issue raised or resolved by the Supreme Court. Nor was it necessary to the Court's ultimate holding.

Undoubtedly "*dicta* from the Supreme Court is not something to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11ᵗʰ Cir. 2006). But that rule only applies where the Supreme Court *dicta* is "well thought out, thoroughly reasoned, and [a] carefully articulated analysis." *Id*.; *see also Hengle v. Treppa*, 19 F.4th 324, 346-47 (4ᵗʰ Cir. 2021)(Supreme Court *dicta* is entitled to great weight only where the Court's opinion engaged in an "extended discussion" of an issue, not a discussion that was "peripheral" or so cursory as to suggest that the Court gave less than "full and careful consideration to the matter;" the issue was "important, if not essential to the Court's analysis," and the *dicta* is "recent and not enfeebled by later statement").

The Fourth Circuit has rightly declined to follow Supreme Court *dicta* that was "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4ᵗʰ Cir. 2008); *see also id.* at 283 (refusing to "afford[] talismanic effect" to unexplained Supreme Court *dicta*). And the Eleventh Circuit has taken a similarly circumspect approach, focusing on the level of analysis in the *dicta*. *Compare Reynolds v. Behrman Capital IV L.P.*, 988 F.3d 1314, 1322 (11th Cir. 2021)("Giving the Supreme Court's *dicta* the respect

and consideration it is due ... we choose to go in a different direction.") *with Schwab*, 451 F.3d at 1325 (following Supreme Court *dicta* because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of *dicta*").

*Heller*'s "longstanding prohibitions" *dicta* is precisely the kind of Supreme Court *dicta unentitled* to "talismanic effect." It was "unaccompanied by any analysis," and "peripheral" to the question at issue. The Court provided no "extended discussion" on the point, and "never actually addressed the historical pedigree" of felon-disarmament laws. *Kanter*, 919 F.3d at 445 (Barrett, J., dissenting). To the contrary, the Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] *not* undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626 (emphasis added). In other words, the *Heller* Court did *not* claim that it had surveyed the relevant history and discovered a tradition of felon-disarmament laws dating back to the Founding era. It simply asserted such laws were "longstanding" and therefore presumptively lawful, "without any reasoning or explanation." Adam Winkler, *Heller's Catch-22*, 56 U.C.L.A. Law Rev. 1151, 1567 (2009); *see also United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons."). This Court should be "reluctant to place more weight on these passing references

than the [Supreme] Court itself did." *Kanter*, 919 F.3d at 445 (quoting *United States v. Mesa-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015)).

That is particularly true here, since felon-disarmament laws are actually *not* "longstanding" in the sense that *Bruen* would use that term. Indisputably, no American jurisdiction enacted such a law until the twentieth century. Thus, *Heller*'s discussion of "longstanding" felon-disarmament laws is not simply *dicta*; it is *dicta* based on a factually unsupportable premise. Where a firearm regulation suffers from a "lack of historical pedigree," it is "particularly proper" to "refus[e] to give *Heller* conclusive effect." *Tyler*, 837 F.3d at 687.

Other parts of *Heller* confirm that the *dicta* the government relies on here cannot control. Notably, Justice Breyer, dissenting in *Heller*, criticized the reference to longstanding felon-disarmament laws as "ipse dixit," underscoring that the majority had "fail[ed] to cite any colonial analogues" to such statutes." 554 U.S. at 721-22 (Breyer, J., dissenting). The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. That rejoinder suggests that the *Heller* majority assumed felons can be deprived of the Second Amendment right *if* that deprivation were consistent with history and tradition (an issue it expressly did not consider). The Court's allusion to "expounding on the historical justification" for felon-disarmament laws would make no sense if *Heller* had held felons could be disarmed regardless of whether history supported that exclusion. Crucially, the *Heller* majority stressed that it had *not*

canvassed the historical record and made a determination, one way or the other, about whether that record supported felon-disarmament laws. 554 U.S. at 626 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment").

If there was any doubt that the "longstanding prohibition" language was nonbinding *dicta*, *Bruen* resolved that doubt in two ways. First, *Bruen* reaffirmed that *Heller* did *not* purport to settle any questions beyond those necessary to resolve the petitioners' claim. 142 S.Ct. at 2128 (noting *Heller* described the Second Amendment right as "not unlimited," but adding, "That said, we cautioned we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban").

Second, in the sentence before the Court's reference to "longstanding prohibitions" on felons' possession of firearms, the *Heller* Court wrote that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626. Fourteen years later, the Court in *Bruen* confronted a challenge to a New York law severely restricting the concealed carry of firearms in public. 142 S. Ct. at 2122-23. If *Heller*'s casual description of concealed-carry bans as constitutional were dispositive, *Bruen* would have been an easy case: the Court would simply have deferred to *Heller*'s prior approval of such laws and upheld New York's statute on that basis. But of course, that is not what the Court did.

The Court instead undertook an exhaustive historical survey of the law governing concealed carry, from medieval England up to late-19th-century America. *Id.* at 2135-56. And "[a]t the end of th[at] long journey through the Anglo-American history of public carry," *id.* at 2156, the Court reached a conclusion different from its offhand remark in *Heller*, holding that laws burdening concealed carry are *un*constitutional, at least where the state also forbids open carry. *See id.* at 2144-47, 2150. In short, *Bruen*'s contradiction of *Heller*'s dicta regarding the permissibility of concealed-carry bans shows that *Heller*'s passing statement on felon-disarmament laws is likewise not determinative.

*Bruen*'s lesson for § 922(g)(1) is clear. Rather than treating *Heller*'s "longstanding prohibitions" passage as dispositive, lower courts must investigate the historical record to determine whether felon-disarmament laws are consistent with the Second Amendment. And indeed, the need for historical inquiry is even greater with respect to felon-disarmament laws than it was with respect to concealed-carry bans in *Bruen*. *Heller* seemingly blessed the constitutionality of concealed-carry prohibitions by citing four sources—two cases and two treatises. 554 U.S. at 626. But for felon-disarmament laws, by contrast, *Heller* cited nothing at all. *Id.* at 626-27. If the four sources supporting concealed-carry bans were insufficient to stave off a fuller historical analysis in *Bruen*, then it necessarily follows that *Heller*'s cursory approval of felon-disarmament laws does not end the Second Amendment inquiry.

The passing references to law-abiding citizens in *Bruen* do not override this analysis and suggest, by negative implication, that the Second Amendment "right" excludes the non-law-abiding, which was not a question at issue in either case. Nowhere did the *Bruen* Court say Second Amendment rights are *limited* to law-abiding citizens. *Bruen* had no occasion to decide whether the Second Amendment is limited to the law-abiding, because "in the pleadings below" the petitioners described themselves as "law-abiding, adult citizens." 142 S. Ct. at 2124-25. Thus, the only question in *Bruen* involved application of New York's proper-cause requirement to law-abiding citizens. The Court did not go—and could not have gone—any further. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm.").

*Bruen* confirms that it is a mistake to read the "law-abiding citizen" language in either *Heller* or *Bruen* as a limitation on the Second Amendment. In the same way *Heller's* description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other places, *Bruen's* mention of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other people.

Finally, more generally, lower courts do not read Supreme Court opinions through a process of negative implication. The Supreme Court has said, for instance, that "the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). No lower court would conclude from this statement that the First Amendment protects *only*

"political" speech, and an inference-by-omission is no more warranted in the Second Amendment context. *See Bruen*, 142 S. Ct. at 2156 (cautioning that right to bear arms "is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.").

XI.   **This Court should reject the Government's invitation to not follow the *Bruen* framework strictly.**

The Government claims that "It makes little sense to apply such a presumption [of unconstitutionality] to laws that target criminal actors or to regulations that secure sensitive spaces such as prisons or courthouses." On the contrary, that is exactly what the Supreme Court demanded that we do in *Bruen*. Whether or not it makes sense is neither here nor there, it is the law of the land. Additionally, the reference to sensitive spaces is a red herring—that is not the issue that is presently before this Court.

The Government's argues that the holding of *Bruen* should not be followed because a flood of constitutional litigation will result. So be it. The flood has arrived. Fortunately, there is an entire legal apparatus where some very fine legal minds are work hard every day to resolve these issues. It would be a shame for such talent to go to waste.

The Government, in a moment of clarity, successfully differentiates Mr. Jones's case from *Bruen: "Bruen* involved general rights of gun access for law-abiding citizens. Conversely, Jones has multiple felony convictions." That is the only salient difference—both cases involve the criminalization of an individual's right to possess a handgun for self-defense. The question before the *Bruen* court was

whether New York could disarm a law-abiding citizen from possessing a handgun in public. The Supreme Court established the proper means of addressing the question, and it concluded that New York's regulation did not pass constitutional muster. The question before this Court is whether the United States can Constitutionally disarm a person solely on account of a prior felony conviction. This Court is bound to apply the same methodology, and it will come to the inevitable conclusion that the United States may do no such thing.

The Government's position is if a person drives twenty-six miles per hour on Saint Louis Street in Mobile Alabama—which is a violation of the law—then that person immediately and permanently forfeits a Constitutionally protected individual right. They reason that even though the Second Amendment does not actually say so, it protects a fundamental individual right that only exists for law-abiders. This proposition is absurd. Rights do not only belong to those who strictly toe the government's line.

Three out of the ten Amendments in the Bill of Rights are specifically for people that are criminally accused. The Founders were well aware of the tendency for governments to use criminal law as a means to oppress the People, and as demonstrated by their sanctification of the protection of rights of criminals and the criminally accused to the highest order. They would not have understood a fundamental right to be so strictly tied to obedience to the government.

XII.   ***Bruen* abrogated *Rozier*.**

The Government next tries to argue that *Rozier* has already decided the issue and is still good law. Again, Mr. Jones anticipated this and addressed the Government's points in the Motion to Dismiss. *Rozier* did not apply the historical and textual standard required post-*Bruen*. *Rozier* could not have cited "*Heller's* analysis of the prohibition and the established principle that a felony conviction affects an individual's rights," because the *Heller* court undertook no such inquiry. Even if *Rozier* did not reach a "means-end" analysis step, it certainly did not follow the analytical steps subsequently laid out by *Bruen*.

*Bruen* abrogated the entire body of Second Amendment caselaw in this Circuit that had developed after *Heller*, including *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)(per curiam). *Bruen* did far more than "tweak the test," as the government claims. Gov't Br. at 9. *Bruen* upended the way courts approach Second Amendment litigation and changed the analysis entirely by "ma[king] the constitutional standard endorsed in *Heller* more explicit," 142 S.Ct. at 2134, by mandating that text and history be considered sequentially, and by explaining the rules and burdens at each stage.

Regarding *Rozier*, *Bruen* rejected the threshold analysis applied in that case, which did not focus at all on the plain text of the Second Amendment, but rather asked simply whether the defendant was "*qualified* to possess a firearm." 598 F.3d at 770-01. *Rozier* held that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment," *id*. at 771, without considering *Heller*'s specific determination that reference to "the people" in

the Second Amendment "unambiguously refers" to "all Americans," 554 U.S. at 579-81. Then *Rozier* conflated *Bruen*'s two steps by injecting history into what should have been a purely textual analysis. The *Rozier* panel concluded that the defendant was not qualified to possess a firearm because of *Heller*'s *dicta* about "longstanding prohibitions on the possession of firearms by felons." 598 F.3d at 771.

The government attempts to lessen *Bruen*'s impact on *Rozier*'s analysis by arguing that *Rozier* did not "depend on" the means-end scrutiny rejected in *Bruen*, Gov't Br. at 22, even though *Rozier* uses means-end scrutiny language when it speaks of "weigh[ing]" a defendant's Second Amendment right, *see* 598 F.3d at 771. Also, Eleventh Circuit cases decided after *Rozier* clearly articulated a means-end scrutiny test for Second Amendment claims. *See*, e.g., *GeorgiaCarry.Org, Inc., v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012).

Whether *Rozier* actually depended on means-end scrutiny is almost beside the point because, whatever standard *Rozier* applied, it was not the *Bruen* standard. As a result, *Rozier* is not good law after *Bruen. See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008)(abrogation of precedent may occur where an intervening Supreme Court decision "clearly set[s] forth a new standard").

Additionally, as noted in the Motion to Dismiss, *Rozier*'s proposition that individuals must somehow be "qualified" before their rights are protected by the constitution is preposterous. Where in the Constitution does it lay out the "qualification" for individual rights? What other individual rights have similar "qualification" requirements? If the Government can simply take an end-run around

the Constitution by deeming anybody that it does not like as "unqualified" to enjoy

its protection, then what value does Constitutional protection actually have?

XIII. **The government cannot meet its burden of showing that §922(g)1 is consistent with the Nation's historical tradition of firearms regulation.**

Finally, the Government makes an attempt to meet its burden under *Bruen,* and, predictably, fails to do so. It bears noting that the Government has not consulted with an expert historian, and cites legal, rather than historical, sources. The judges that wrote these legal opinions are no doubt qualified legal minds, but they are not trained historians. To the best of Mr. Jones's knowledge, the Government has never once consulted a historian in *any* litigation surrounding the Second Amendment, even though the Supreme Court in *Bruen* places such a burden squarely on the Government's shoulders. Its reluctance to engage with the history is understandable because the historical facts do not support the Government's position.

C. **The government applies the wrong legal standard**.

Bruen requires answering a threshold question: Does the "challenged regulation address[] a general societal problem that has persisted since the 18th century," or does it address "unprecedented" societal concerns that "were unimaginable at the founding"? 142 S.Ct. at 2131-32. If the former, the government must establish a historical tradition of "distinctly similar" regulations. Id. at 2131. This "relatively simple" and "straightforward historical inquiry" requires the government to identify a tradition of founding-era statutes that are nearly the same as the challenged

regulation. Id. at 2131-32. By contrast, the government can identify a tradition of "relevantly similar" historical analogues if, but only if, the challenged statute targets a problem unfamiliar to the founding generation. Id. at 2132.

As a preliminary matter, as discussed in the Motion to Dismiss, the "ubiquity of capital punishment" at the time of the drafting of the Second Amendment referenced on page twelve of the Government's Brief is not historically accurate. "At the Old Bailey, London's chief criminal court, more than two-thirds of all felons from 1718 to 1775 were ordered for exile. By contrast, only about one in every six received the death penalty."[6] Of those sentenced to death, through a variety of pardons, commutations, and other means, "less than a fifth of death sentences were actually carried out." [7]

Following the Transportation Act of 1718, tens of thousands of Colonial Era convicted felons were subjected to penal transportation, including to the American Colonies. "Between 1700 and 1775, a total of 585,800 immigrants arrived in the 13 colonies from all over the world. About 52,200 of these immigrants were convicts and prisoners (9%)."[8] To a large degree, the peopling of what would become the United States of America was carried out by convicted felons transported against their will.

---

[6] Ekirch, A. Roger. "Bound for America: A Profile of British Convicts Transported to the Colonies, 1718-1775." *The William and Mary Quarterly*, vol. 42, no. 2, 1985, pp. 184–200. JSTOR, https://doi.org/10.2307/1920427. Accessed 21 Sept. 2023.

[7] Tim Hitchcock, Robert Shoemaker, Clive Emsley, Sharon Howard and Jamie McLaughlin, et al., The Old Bailey Proceedings Online, 1674-1913 (www.oldbaileyonline.org, version 7.0, 24 March 2012).

[8] Vaver, Anthony. "Bound with an Iron Chain: The Untold Story of How the British Transported 50,000 Convicts to Colonial America." Pickpocket Publishing (June 30, 2011) p.7.

Domestically convicted felons were also seldomly executed. While there were indeed numerous offenses punishable by death, "[t]he number of executions was relatively low in the colonial period."[9] The realities of colonial America's task of taming a wilderness in the face of indigenous resistance demanded the participation of every able-bodied person, so governments would not have lightly destroyed their human resources. Additionally, religious ideas, particularly those of the Quakers, were already anti-capital punishment in the 18th century. The New Jersey colony had no death penalty, and Pennsylvania reserved it only for murder and treason.[10] "Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,'" and "while the term 'felony' was once 'very strongly connected with capital punishment,' that was no longer true" by the time the Constitution was ratified. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); accord *Folajtar v. Att'y Gen.*, 980 F.3d 897, 920 (3d Cir. 2020)(Bibas, J., dissenting)(same).

Clearly, the Founders were surrounded by large numbers of still-living convicted felons. It is indisputable that firearms were commonplace in early America. The social issue of those people possession those firearms is one that the Founders would have been perfectly familiar with. The Government's contention that the concept of armed living people with felony convictions were unheard of in the eighteenth century is entirely without merit.

---

[9] Gottlieb, Gabriele. "Theatre of Death: Capital Punishment in Early America, 1750-1800." University of Pittsburgh 2005.
[10] Reggie, Michael H. (1997). "History of the Death Penalty". In Laura E. Randa (ed.). Society's Final Solution: A History and Discussion of the Death Penalty (online version). University Press of America, Inc.

The government denies that Bruen establishes this dual-track review and tries to avoid application of the "distinctly similar" test by arguing that (1) it "need only identify 'a well-established and representative historical analogue,'" not "a historical twin," and (2) disarming felons was not a problem in the early Republic because felons were subjected to "literal or civil death" for their crimes. Gov't Br. at 10-11. It then tries to satisfy the "relevantly similar" test by sh owing that § 922(g)(1) is similar to "traditional punishments for felons" and "other persons deemed to be disloyal, unvirtuous, or otherwise threatening to the state." Id. at 10-20.

With this line of argument, the government has implicitly conceded that it cannot satisfy the proper "distinctly similar" test. That should end the inquiry.

### D.  <u>Even if the "relevantly similar" test applies (it does not), the government has failed to carry its burden.</u>

Assuming for sake of argument that the "relevantly similar" standard is available, the government still has failed to carry its burden. It points to two supposed traditions to support § 922(g)(1): (1) laws authorizing capital punishment and property forfeiture for felons and (2) laws disarming "unvirtuous" people. Gov't Br. at 10,11. Neither is sufficient.

The government contends that § 922(g)(1) is constitutional because disarmament bears "striking similarities to other punishments that felons typically faced." Id. at 11. After all, being prohibited from possessing a firearm under § 922(g)(1) is less of a burden than being executed or stripped of one's "lands and

goods." Id. This comparison misunderstands the "metrics" of the "relevantly similar" test. 142 S.Ct. at 2133.

Under that test, courts ask "whether modern and historical regulations impose a comparable burden *on the right of armed self-defense.*" *Id.* (emphasis added). The relevant "burden" is the burden on the right to keep and bear arms–not some generalized, cumulative burden on any or all of the various legal interests a citizen possesses, such as his right to own property or his right to life. Thus the proper question is whether § 922(g)(1) and the government's felony-punishment laws burden the arms right to a "comparable" degree. The answer is no.

Section 922(g)(1) is a categorical, lifetime ban on possessing firearms. Under that statute, a felon may never possess a firearm again, even after completing his sentence. The forfeiture laws referenced by the government are different. Gov't Br. at 31. They generally provided that people convicted of certain felonies had to forfeit their "lands and goods," which presumably included their firearms, before entering prison. But nothing in those statutes prevented felons from acquiring new firearms upon release from prison. Besides, those statutes applied only to a small subset of felonies, whereas § 922(g)(1) covers almost all felonies. See 18 U.S.C. § 921(a)(20). Accordingly, § 922(g)(1) imposes a much more severe "burden on the right of armed self-defense" than do the government's "historical regulations." Bruen, 142 S.Ct. at 2133.

Similarly, those historical regulations and § 922(g)(1) are not "comparably justified" in terms of the burden they impose on the right to keep and bear arms. Id.

Section 922(g)(1) is a preventive measure that disarms felons because Congress believes they would pose a danger to public safety if allowed to possess guns. By contrast, the government's historical regulations disarmed felons purely as punishment, for reasons having nothing to do with public safety. That those laws were not limited to firearms forfeiture, but instead reached all a defendant's property, demonstrates that they were not justified by a fear that felons' use of firearms would endanger public safety.

Mr. Jones anticipated that the Government would analogize disarmament with regulations depriving felons of civic rights, such as disenfranchisement laws. As he has already explained, *Heller* and *Bruen* teach us that the Second Amendment protects an individual right, not a civic right.

Section 922(g)1 does not "sits neatly on top of...enduring historical lineage." Gov't brief at 15. There is no "enduring historical lineage" of permanent, categorical felon disarmament until the twentieth century. Any "lineage" that the government references can only be the vaguest and broadest tradition of governments defining and punishing crimes in general. Of course, governments, including those in the 1790's, absolutely had the power criminalize activities and define punishments for those crimes. What matters here, is that Founding era legislatures specifically chose *not* to enact laws like § 922(g)1.

The government's reliance on Founding-era laws disarming "unvirtuous" people operates at too high a level of generality because, contra *Bruen*, it deduces a broad principle (that "unvirtuous" people can be disarmed) by aggregating a small

number of disparate and discrete regulations (laws disarming slaves, Native Americans, Catholics, and disloyal subjects) and then applies that principle in ways untethered to the historical record. The unvirtuous category is also impermissibly malleable and applying the label would plunge courts back into the means-end balancing from which *Bruen* delivered them.

The government's "unvirtuous" argument proceeds in three steps: (1) cite a handful of founding-era laws disarming Catholics, slaves, Native Americans, and people who refused to swear a loyalty oath, (2) isolate a characteristic that supposedly unites these groups (unvirtuousness), and (3) wield that label to disarm any group that a modern legislature considers unvirtuous, even if that group was never disarmed at the founding. But this is precisely the gambit Bruen rejects.

The label "unvirtuous" is amorphous and manipulable. It lacks a limiting principle and thus is an unsuitable metric for deciding who enjoys Second Amendment rights. A district court made a similar point in a recent Second Amendment challenge to 18 U.S.C. § 922(g)(3), which prohibits firearm possession by an "unlawful user" of a controlled substance. *United States v. Harrison*, 2023 WL 1771138, at *1 (W.D. Okla. Feb. 3, 2023). The government argued that § 922(g)(3) was analogous to historical laws disarming "'lunatics," since "drug users, like the mentally ill, have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id*. at *19. But that argument, the court observed, "appears to have no limit"; it could be used to justify disarming a seemingly limitless number of other groups who supposedly "have difficulty exercising self-

control," *e.g.*, people suffering from "autism, attention deficit disorder, [or] nicotine dependence." *Id*. The government's approach, the court wrote, is unmoored from the historical record and would invest legislatures with boundless power to deny firearms to virtually any group they wished. *Id*. at *19 n.134.

Finally, there is no principled way to apply the "unvirtuous" standard without resurrecting means-end balancing. Given the elasticity of a term like "unvirtuous," the inevitable result would be "judicial deference to legislative interest balancing," which is "not" "appropriate" in the Second Amendment context. *Bruen*, 142 S.Ct. at 2131.

Even putting aside these conceptual problems with the "unvirtuous" category, the historical regulations cited by the government do not demonstrate that § 922(g)(1) is consistent with America's tradition of firearms regulation. The government relies on what it calls the "'dominant understanding' of the firearm right during early America," which it gleans from a single law review article that pre-dates *Bruen* by two decades. Gov't Br. At 18. Such vague allusions to a "dominant understanding" not backed up by citations to specific statutes do not satisfy the government's heavy burden under *Bruen* step two. 142 S.Ct. at 2133. The only actual laws the government cites are one 17th-century English law relating to Catholics and a handful of laws relating to "non-associators," loyalty oaths, and Native Americans. *Id.*

Nor were these 17th- and 18th-century laws "comparably justified." Whereas § 922(g)(1) is intended to prevent interpersonal violence, the "purpose" of the

Catholic-disarmament laws was "to preclude armed insurrections" and rebellion by a group considered "disloyal and seditious." *Id*. at 258-60, 263. Moreover, this English law does not amount to a "well-established and representative historical tradition. *Bruen*, 142 S.Ct. at 2133. The *Bruen* Court "doubt[ed]" that regulations from three out of thirteen colonies were sufficient to establish a historical tradition. *Id*. at 2142. It necessarily follows that a single law from 17th-century England is inadequate.

The government claims that "A felony conviction evinces a disregard for social order and a breach of the public trust that is akin to disloyalty or dangerousness that subjected classes of persons to firearm regulations." Gov't Br. at 19. That is a blatant false equivalency. Put simply, committing a sundry crime is not the same as committing an act of violent overthrow of the government. The Constitution illustrates the vast gulf between treason and ordinary crimes, as it heightens the burden for a conviction of treason: "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court. U.S. Const. Art. III. § 3.

The government is then so bold as to claim that "Governments punish crimes to protect the public from breaches of the peace." Gov't Br. at 19. Sometime governments may in fact punish crimes to protect the public. But Governments also punish crimes for a variety of other reasons, some of which are malicious. The government's own citation says nothing about protecting the public, but rather protecting the sovereignty of the government. *Id.* The government, understandably,

takes a rosy view of governments, but governments have undertaken such illustrious policies as the Great Leap Forward, the Congo Free State, and the Holodomor. The United States Government and the governments of the several states have themselves at times criminalized consensual gay sex, (Bowers v. Hardwick, 478 U.S. 186 (1986)), harboring escaped slaves (Fugitive Slave Law of 1850), and being a Native American living on his or her ancestral home (Indian Removal Act of 1830). Needless to say, not doing what the government tells you to is far from an automatic indicator that you are a dangerous or disloyal person.

The government points to "numerous early laws" banning gun ownership by Native Americans and the "disloyal," but it only cites five such laws. Gov't Br. at 18-19. The laws banning gun possession by Native Americans are distinguishable because Native Americans were not understood to be "a part of the 'political community' of persons protected by the Second Amendment," *Harrison*, 2023 WL 1771138, at *20. As a result, restrictions on their Second Amendment rights tell us nothing about the scope of arms-bearing permitted to those who were among "the people." *See Jimenez-Shilon*, 34 F.4th at 1047 ("Neither the Indian nor the slave was a citizen of the British colonies and, accordingly, neither was entitled to the rights of English subjects."). These laws also were not "comparably justified" relative to § 922(g)(1). *Bruen*, 142 S.Ct. at 2133. Like the Catholic-disarmament statutes, they were meant to neutralize "people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir.), *cert. granted*, 143 S.Ct. 2688 (2023);

*see also* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994)(noting slave-disarmament laws were motivated by perceived "need for racial control").

Likewise, § 922(g)(1) and statutes disarming "those who would not participate in the American Revolution," "'non-associators,'" and people who would not make "loyalty oaths," Gov't Br. at 42, do not impose a "comparable burden" on the right to keep and bear arms. *Bruen*, 142 S.Ct. at 2133. People disarmed under loyalty statutes could regain the arms right at any time simply by swearing a loyalty oath, *see* Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 157 (2007), whereas § 922(g)(1) defendants have no similar ability to restore their right to arms. And even when states took arms away from someone who refused the oath, that person was free to acquire new firearms, unlike a § 922(g)(1) defendant. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 724 (2009)(explaining loyalty statutes "did not technically prohibit recusants from acquiring new arms," since they "read more like forfeiture laws than disabilities").

Loyalty statutes also were not "comparably justified." *Bruen*, 142 S.Ct. at 2133. Unlike § 922(g)(1), which seeks to prevent interpersonal violence, the loyalty statutes were meant to neutralize those "considered dangerous to the *state*," *i.e.*, those who might rebel or otherwise undermine the stability of government because of their loyalty to Great Britain. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-07

(2004)(emphasis added); *see Greenlee*, 20 Wyo. L. Rev. At 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them.").

XIV.   **The government's remaining arguments hold no water.**

The government makes a couple of other arguments that are unpersuasive. The government contends that § 922(g)(1) is analogous to historical laws that "excluded felons from participation in the political process." Gov't Br. at 10. However, *Heller* "expressly rejects the argument that the Second Amendment protects a purely civic right," *i.e.*, a right that "requires citizens to act in a collective manner for distinctly public purposes." *Kanter*, 919 F.3d at 462-63 (Barrett, J., dissenting). *Heller* held the Second Amendment protects "an individual right unconnected with militia service," rather than a "collective" right that "may be exercised only through participation in some corporate body." 554 U.S. at 579, 605. Thus the right to bear arms is not a "civic" right, and laws excluding felons from exercising civic rights, such as voting, are irrelevant to the Second Amendment.

XV.   **Section 924(c) is unconstitutional.**

*Bruen* applies to §924(c). The relevant conduct prohibited by the statute is the possession of a firearm, which lies at the core of the Second Amendment. The statute criminalizes conduct falling within the Amendment's plain language—using and carrying a firearm—and addresses a "'societal problem that has persisted since the 18th century,'" and yet has no "'distinctly similar'" historical precedents. (*Bruen*, 142 S. Ct. at 2131).

Rather than identifying any such distinctly similar precedents, the government notes that "The Second Amendment protects self-defense, not criminal activity." (Doc 40 at 13.) This observation would be pertinent if Mr. Jones were invoking the Second Amendment to challenge Counts 1 and 2, which charges him possession with intent to distribute marijuana and conspiracy to do the same. (Doc. 1.) The Government characterizes these as "serious crimes," despite the fact that the same conduct is legal and commonplace across the majority of the country. The Second Amendment does not entitle Mr. Jones to commit crimes with impunity, simply because he uses a weapon to do so. But Mr. Jones's challenge here is to Count 3, and thus implicates only the peculiar offense articulated in § 924(c) and charged in that count. Consistently with the statute, Count 3 charges Mr. Jones with (among other things) "carr[ying]" the weapon "during and in relation to" the crimes charged in Counts 1 and 2. (Id. at 2.)

The phrase "during and in relation to" has been given a broad construction that does not require that the weapon be discharged, displayed in a threatening manner, or even displayed at all. *Muscarello v. United States*, 524 U.S. 125 (1998). Thus, § 924(c) is akin to a statute making it criminal for an individual to "express harsh criticism of the President during and in relation to the malicious destruction of federal government property." The gravamen of such an offense would be clearly protected by the First Amendment—but by the government's lights, it could nevertheless be criminalized if performed "during and in relation to" conduct that is not constitutionally protected. If, for example, an individual

were to smash the windows of a federal government vehicle while loudly proclaiming, "President Biden is raping this country," he could be prosecuted not only for destroying federal property, but also for exercising his First Amendment right to express political speech during and in relation to that act. The government does not explain why this sort of constitutional nullification-by-association should be permitted.

No analogous historical regulations exist. The government does assert that § 924(c) is consistent with the common-law offense of going armed for the purpose of "terrorizing the general public" (Doc. 40 at 14), but this common-law offense is hardly "distinctly similar" (Bruen, 142 S. Ct. at 2131) to a crime that may involve keeping a weapon "in the locked glove compartment or trunk of a car." *Muscarello*, 524 U.S. at 127. In sum, § 924(c) is facially unconstitutional.

XVI.   **26 U.S.C. § 5861(d) is unconstitutional.**

26 U.S.C. § 5861(d) regulates Second Amendment activity. It prohibits the possession of firearms. It applies to all people and all firearms, not only "dangerous devices," as the Government implies. The caselaw cited by the government is out of date.


18 U.S.C. § 922(g)1, 18 U.S.C. §924(c), and  26 U.S.C. § 5861(d) are unconstitutional on their faces. This Court should grant Mr. Jones's motion to dismiss.

Respectfully submitted,

/s/ Colin J. Fitzpatrick
COLIN J. FITZPATRICK
Assistant Federal Defender
Florida State Bar No: 1019998
Federal Defenders Organization, Inc.
11 N. Water Street, Suite 11290
Mobile, Alabama 36602
(251) 433-0910

## CERTIFICATE OF SERVICE

I do hereby certify that I have electronically served a true and correct copy of the foregoing notice upon A.U.S.A., Elizabeth Stephens, on this    22nd        day of September 2023.

/s/ Colin J. Fitzpatrick